IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PATRICIA HURDIS,

       Plaintiff,      OPINION AND ORDER

  v.

               12-cv-00601-wmc

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

       Defendant.

Pursuant to 42 U.S.C. § 405(g), plaintiff Patricia Hurdis ("Hurdis") seeks judicial review of a final decision of the Commissioner of Social Security denying her claim for disability benefits. Hurdis principally contends that the Administrative Law Judge ("ALJ"): (1) the ALJ's mis-application of the onset date and date last insure; (2) the ALJ's improper dismissal of Hurdis's migraines and mental impairments as nonsevere and (3) the ALJ's failure to properly assess Hurdis's credibility. For the reasons set forth below, the court will remand the case to the Commissioner for further proceedings.

BACKGROUND

A.  Procedural History

On June 24, 2011, the ALJ issued a decision denying Hurdis's application for Disability Insurance Benefits ("DIB"). (AR 27.) On July 2, 2011, Hurdis filed a timely request for review by the Appeals Council. (AR 14.) The Appeals Council denied that request on July 9, 2012, making the ALJ's decision the final decision of the Commissioner of Social Security. (AR 1.) On August 17, 2012, Hurdis filed a timely

complaint for judicial review pursuant to 42 U.S.C. § 405(g).  (Dkt. #1.)

### B.  Plaintiff's Testimony

Hurdis was 41 years old on the date of the ALJ's decision, has an associate's degree in data processing, and past relevant work as a collection clerk.  (AR 51, 52.) Hurdis testified that she stopped working in April 2006 because (1) she had pain in her joints, lower back, hip, and shoulders and (2) could not sit or stand for extended periods of time.  (AR 53, 55.)  Specifically, Hurdis testified that sitting longer than 10 minutes at a time caused shooting pain down her left leg and her toes to go numb. (AR 54.) Further, after standing up, Hurdis testified that her shoulders would throb with sharp, stabbing pains.  (AR 54–55.)

Hurdis also testified that she suffered from "cluster" migraines that lasted between one to three weeks, which she treated with pain medication.  (AR 54-55.)  Hurdis testified that she also saw a headache specialist named Dr. Bailey in Delafield, Wisconsin.  (AR 54.)  He performed a nerve block with injections to the back of her neck.  (AR 54.)

In 2006, Hurdis lived with her husband and 14-year old daughter.  (AR 56–57.) Because she was unable to sit after leaving work, Hurdis testified that she did not do much around the house.  (AR 56.)  Hurdis would sometimes shower, but at times would have to wait for her husband to get home so he could help her lift her leg to get her pants on.  (AR 56.)  Hurdis also described having to lie down 99 percent of the time and use crutches to go to the bathroom.  (AR 58.)  She also testified that she could not cook or

2

clean (AR 58-59), although Hurdis completed a Function Report in April 2009 stating that she could perform household chores and laundry.  (AR 177, 179.)  Hurdis was able to take her daughter to and from school and help her with homework, but her daughter's school was just three blocks away and Hurdis testified that she could not drive farther than that because it hurt her left side.  (AR 57.)

Hurdis could not remember what medications she was on in 2006, but did remember using a transcutaneous electrical nerve stimulation ("TENS") unit.  (AR 56.) However, the TENS unit did not help reduce her pain, so she sent it back.  (AR 56.)

### C. Objective Medical Evidence of Physical Impairments

#### 1. 2006

On October 6, 2006, Hurdis was treated by Dr. Scott Stanwyck for left hip pain she had been having for about eight months.  (AR 494–95.)  Hurdis told Dr. Stanwyck that sitting, standing, and walking made it worse, while a heating pad made it better, and that the pain occasionally radiated down her left leg.  (AR 495.)  Dr. Stanwyck noted Hurdis had normal gait, but her right leg was approximately ½ inch shorter than her left. (AR 495.)  Dr. Stanwyck diagnosed Hurdis with trochanteric bursitis of the left hip and injected Marcaine and Kenalog into her left trochanteric bursa.  (AR 495.)   These injections significantly reduced Hurdis's discomfort.  (AR 495.)

In November, Hurdis saw Dr. Scott Stanwyck for a follow up visit.  (AR 494.) Hurdis told Dr. Stanwyck that the injection improved her discomfort to some degree on

her left side, but that she now experienced back pain radiating down her left leg into her left foot.  (AR 494.)  Because of Hurdis's consistent left leg pain and discomfort, Dr. Stanwyck ordered an MRI of her lumbar spine.  (AR 494.)  The MRI came back normal, failing to reveal the cause of her pain.  (AR 318.)

Also in November, Hurdis was treated by Dr. Robert Zoeller for lower back and leg pain.  (AR 374–76.)  As reported to Zoeller, Hurdis started to experience increased pain in her lower back, left hip, and leg in April of 2006.  (AR 374.)  The pain was sharp aching and burning in nature, with some associated numbness and tingling.  (AR 374.)  Hurdis told Zoeller that she had received about six months of chiropractic treatment with no long-term benefit, and that Ibuprofen, Celebrex, and Tramadol provided only modest relief.  (AR 374.)  Furthermore, she reported that the injection Hurdis received from Dr. Stanwyck resulted in "two to three hours of modest improvement in the outer aspect of her left hip pain," but that the rest of her pain remained.  (AR 374.)

At the time she saw Dr. Zoeller, Hurdis rated her pain between 6 and 10 on a 10 point scale and noted that the pain was worse with prolonged bending, lifting, squatting, and twisting.  (AR 374.)  She also reported that the pain got somewhat better when lying down.  (AR 374–75.)

On examination, Dr. Zoeller found (1) Hurdis's thoracolumbar range of motion mildly limited with regard to forward flexion, and (2) hip range of motion was limited with flexion, adduction, and internal rotation, causing pain in her left leg.  (AR 375.)  Hurdis also had (1) palpable trigger points over the gluteus medius and maximus, (2)

4

tenderness over the trochanteric bursa and piriformis, and flexion, adduction, and (3) internal rotation of the left hip resulted in significant pain into her left leg.  (AR 375.)

Dr. Zoeller diagnosed Hurdis with low back pain with radicular symptoms, likely primarily musculoligamentous, myofascial in origin.   (AR 376.)   Dr. Zoeller also diagnosed Hurdis with possible piriformis syndrome and possible trochanteric bursitis. (AR 376.)  For treatment, Dr. Zoeller prescribed medication, myofascial release, physical therapy modalities, therapeutic exercises, and ultimately, injections if Hurdis's symptoms did not improve.  (AR 376.)

Hurdis had physical therapy for disabling hip pain on November 30, 2006. (AR 367–69.)  Her pain was worse with physical activity, including any kind of walking. (AR 367.)  Hurdis reported that the pain ranged between 6 and 10, and because it was worse at night, she was getting only three to four hours of sleep.  (AR 367.)  Hurdis also said the pain improved somewhat with the use of a heating pad.  (AR 367.)  During therapy, Hurdis's gait evaluation revealed that she "ambulates independently," but has a significant limp on her left leg.  (AR 368.)

On December 21, Hurdis told Dr. Zoeller that she felt "somewhat better" after physical therapy and using a TENS unit, but she continued to struggle.  (AR 365.)  At that time, Hurdis described her pain as localized to the outer aspect of the left hip, but also said it was 9 out of 10 at worst.  (AR 365.)  Dr. Zoeller injected pain medication into the affected areas -- Lidocaine and Depo-Medrol into the left greater trochanteric bursa and Lidocaine and Toradol into both the gluteus medius and gluteus maximus --

5

and encouraged Hurdis to continue with physical therapy, home exercises, and medication.  (AR 366.)

### 2.  2007

Dr. Zoeller treated Hurdis again on January 10, 2007.  (AR 363–64.)  Hurdis was then using over the counter analgesics to treat her pain, although the muscle relaxants were not effective.  (AR 363.)  Her Pain Disability Index worsened to 67 out of 70, meaning she felt "nearly completely disabled by her pain."  (AR 363.)  Dr. Zoeller noted that Hurdis was taking Effexor, Topamax for her headaches, and a hormone replacement.  (AR 363.)    He also observed that Hurdis had a mildly "antalgic gait, and favored her left lower extremity, but could heel to toe walk and perform toe rises.  (AR 363.)

One week later, on January 17, Hurdis saw Dr. Doniparthi, who wrote that Hurdis's pain had gotten progressively worse since April 2006 and was now a constant sharp, aching, stabbing pain, ranging from 8 to 10 on a 10 point scale.  (AR 388.)  The pain was worse with prolonged sitting, standing, walking, and sneezing.  (AR 388.)  Hurdis also complained of numbness and tingling in the left leg and calf and muscle spasms in the left gluteal region and calf.  (AR 388.)  Dr. Doniparthi noted that Hurdis tried trigger point injections which improved her pain for a few days, but was worse in intensity when the pain returned.  (AR 388.)  The injection of the left hip by Dr. Stanwyck in November 2006 was helpful for several days.  (AR 388.)

On physical examination, Dr. Doniparthi noted that Hurdis was awake and alert,

but she was anxious, guarded, and in mild to moderate distress due to the pain.  (AR 389.)  Straight leg raising was positive on the left at 30 degrees, but Hurdis had several areas of tenderness and internal and lateral rotation of the hip was quite painful.  (AR 389.)  Dr. Doniparthi performed left piriformis muscle injections of bupivacaine and Kenalog.  (AR 389.)

On January 31, 2007, Hurdis saw Dr. Doniparthi again and reported that she had 75% improvement of her left sided radicular pain, but that she now has localized left sided gluteal pain and numbness and tingling in the left foot.  (AR 394.)  Dr. Doniparthi also found that Hurdis had a significant amount of "sacroiliac joint tenderness," and injected her with bupivacaine and Kenalog.

Hurdis saw Dr. Doniparthi again on February 12.  (AR 381–83.)  The sacroiliac joint injection provided no overall improvement, and Hurdis continued to report pain ranging from 8 to 9 out of 10.  (AR 381.)  Hurdis described her pain was a sharp, aching, shooting, and tingling sensation, which was worse with prolonged sitting, standing, and walking.  (AR 381.)  Hurdis was using Tramadol every six hours.  (AR 381.)  Dr. Doniparthi found that Hurdis had significant tenderness of the left piriformis region, and again injected bupivacaine and Kenalog.  (AR 381–82.)

On February 27, Hurdis was admitted for a Botox injection.  (AR 378.)  Both the first and second piriformis injections had improved her buttocks and left lower extremity pain, but the pain gradually returned after each.  (AR 378.)  Therefore, Dr. Doniparthi elected to proceed with a Botox injection to the left piriformis muscle.  (AR 379.)  Dr.

Doniparthi again advised Hurdis to continue with physical therapy as tolerated.  (AR 379.)

On March 19, Hurdis saw Dr. Zoeller.  He found her MRI of hip and pelvis to be unremarkable.  (AR 358–59.)  Hurdis told Dr. Zoeller that the trigger point Botox injections she underwent with Dr. Doniparthi provided short-term relief and that her symptoms returned about a week later.  (AR 358.)  Dr. Zoeller observed that Hurdis moved freely throughout the examination room, walked with a symmetric gait, and could heel to toe walk.  (AR 358.)  Dr. Zoeller diagnosed Hurdis with persistent left gluteal pain, some radicular symptoms but no evidence of neurological impairment and myofascial and possible piriformis syndrome.  (AR 359.)  For treatment, Dr. Zoeller prescribed pain medication and home exercise.  (AR 359.)

On April 24, Hurdis saw Dr. Doniparthi again and reported that her previous Botox injection improved her pain by 70% for 1½ months.  (AR 371.)  Upon examination, Dr. Doniparthi found Hurdis's Achilles reflex was absent and there was significant tenderness in the left piriformis muscle region. (AR 371.) Dr. Doniparthi administered another Botox injection. (AR 372.)

In late-September 2007, upon referral from her primary care physician, Hurdis was treated by Dr. Anthony Hoang for pelvic pain.  (AR 354-57.)  She told Dr. Hoang that her pelvic pain increased in the past three weeks.  (AR 354.)  Dr. Hoang found that Hurdis had significant pelvic floor pain with tenderness and spasm of the whole pelvic floor musculature and perineal area.  (AR 355.)  Dr. Hoang opined that there was pelvic

neuromuscular pain with myofascial entrapment syndrome and significant pain associated with the pelvic floor.  (AR 356.)  Dr. Hoang performed trigger point injections with pudendal block to provide pain relief, prescribed physical therapy, occupational therapy, biofeedback, myofascial release therapy, and oral medication.  (*Id*.)  He recommended that Hurdis treat the affected area with heat and warm sitz baths.  (*Id*.)  Dr. Hoang advised Hurdis to return to the clinic once or twice per week as needed for pudendal block/pelvic floor muscle trigger injections.  (AR 361.)

On October 1, Hurdis went for physical therapy with Deeanne Gilling.  (AR 349–51.)  Hurdis again reported having constant pelvic floor pain ranging from 6 to 7 out of 10.  (AR 349.)  This pain worsened with vacuuming, physical activity, and lifting groceries.  (AR 350.)  Nothing decreased the pain.  (*Id*.)  Hurdis also reported that emptying her bladder increased her pain to a 7 or 8 out of 10.  (*Id*.)  Her pelvic floor strength was 2 out of 5; internal palpation of the pelvic floor muscles increased her pain to 10 out of 10; and abdominal palpation increased her pain to 10 out of 10.  (*Id*.)  Ms. Gilling felt Hurdis would benefit from occupational therapy using EMG feedback, general relaxation, myofascial release, pelvic floor strengthening, pelvic floor relaxation, behavioral techniques, patient education, and a home program.  (AR 350–51.)  However, EMG instrumentation was deferred, because Gilling felt that Hurdis could not tolerate it. (AR 350.)

Later in October, Dr. Hoang again treated Hurdis and recommended that she continue with her regimen of physical therapy and medication.  (AR 346-48.)  Dr. Hoang

9

also prescribed Hurdis with Celebrex, Xanax, and Cymbalta, while strongly encouraged her to consider counseling to treat the psychological effects of her pain ("i.e. possible depression or anxiety, or [sic] which she has not exhibited signs or symptoms").  (AR 346–48.)

Hurdis saw Dr. Hoang again in November for chronic pelvic pain.  (AR 343–45.) At that time, Hurdis told Dr. Hoang that her pain level improved from 8-10 out of 10 to 3-5 out of 10.  (AR 343.)  She also reported having 4 to 5 physical therapy treatments and noted an "improvement in the pelvic floor and the pain associated with that."  (AR 343.)  She asked Dr. Hoang to consider whether additional medication could "'tweak' her pain level a little better."  (AR 343.)  Dr. Hoang noted that "overall, she is happy with the current outcome," and he prescribed amitriptyline as an additional pain medication.  (AR 343–44.)

### 3. 2009

Two years apparently passed with no follow up medical exam due to the expiration of Hurdis's insured status in September 2007.  In November 2009, Hurdis saw Dr. Abdul Hafeez for a consultative examination.  (AR 426–28.)  At that time, Hurdis told Dr. Hafeez that she had been suffering from "fibromyalgia for the past two years," that she hurt all over, was stiff and had trouble walking, was tired most of the time, and had trouble sleeping at night.  (AR 426.)  Dr. Hafeez found that despite being on many medications, Hurdis continued to experience significant symptoms and had all the tender spots required for a diagnosis of fibromyalgia.  (AR 428.)

10

That November, Dr. Pat Chan reviewed the medical record and concluded that in the fall of 2007, Hurdis could still perform sedentary work AR 431), but that by April 2009, Hurdis met Listing 14.09 for inflammatory arthritis.  (AR 429.)   As a result, Hurdis was awarded SSI as of that date. (AR 51.)

### D. Medical Evidence of Mental Impairments

With regard to mental impairments, the record reflects Hurdis was hospitalized for depression at Rogers Memorial Hospital from May 11 to May 19, 1999.  (AR 453.) Notes reflect that Hurdis had been suffering from this condition for several years, for which she was taking Effexor, Xanax, and trazodone, but continued to feel tired, anhedonic, hopeless, and unable to deal with life's stresses.  (*Id*.)   In addition to these depressive symptoms, Hurdis suffered from obsessive compulsive symptoms and was compulsively cleaning her home.  (*Id*.)   Hurdis believed that both her husband and other family members had abused her, although her statements regarding this varied during her hospitalization and she wanted to return home to her husband to work things out when her discharge was imminent.  (*Id*.)

Hurdis was again hospitalized for depression and obsessive/compulsive disorder from June 16, 1999 to June 22, 1999.  (AR 445–47.)  Hurdis reported being depressed and suicidal and had not been taking her medication.  (AR 445.)  Upon hospitalization, her medications were resumed and Hurdis seemed to be improving, but then became very angry and requested discharge against medical advice.  (*Id*.)  Hurdis complained that she

11

was not getting the kind of attention and treatment she needed or deserved.  (AR 445–46.)  The therapist wrote at that time that she was highly upset and unhappy with her treatment, was inaccurate or contradictory in her arguments, and was unwilling to discuss her concerns in a calm, reasonable manner.  (AR 446.)  Hurdis was discharged against medical advice on Effexor, Lorazepam, and Remeron and was to follow up with a psychiatrist as an outpatient.  (AR 447.)

An almost ten year lapse in mental health treatment apparently ended on April 20, 2009, when Hurdis was admitted for inpatient mental health treatment for a third time.  (AR 327–29.)  Hurdis told Dr. Schlomer that she did not want to live with the pain and that if she could not get relief, it would not be worth going on.  (AR 327.)  Hurdis was subsequently transferred to Waukesha County Mental Health in the custody of the Oconomowoc Police Department with a diagnosis of depression, suicidal ideation, and back pain. Once hospitalized, Hurdis said her comments about suicide were all a joke and was angry about being in the hospital.  (AR 311.)  Although Hurdis was angry and uncooperative on admission, she became more cooperative later and agreed to follow up with outpatient treatment.  (AR 312.)  Hurdis was discharged on April 21, 2009, with a diagnosis of depression.  (AR 312.)

In May of 2009, Hurdis had a psychological evaluation with Dr. Fudala.  (AR 518–20.)  Dr. Fudala noted Hurdis was on Seroquel and Valium three times per day.  (AR 518.)  Hurdis reported seeing various psychiatrists in the past, but could not remember their names.  (AR 518.)  She also reported mood swings, including aggression.

(*Id.*)  Although Hurdis was not suicidal at the time of examination, she admitted cutting herself superficially in the past.  (AR 519.)  Dr. Fudala diagnosed mood disorder NOS (by history), while ruling out "major depression recurrent episodes" or anxiety disorder. (AR 519.)

In September 2009, Dr. Michael Goldstein examined Hurdis and assessed her psychological condition.  (AR 421–24.)  Dr. Goldstein found no evidence of malingering or factitious illness.  (AR 422.)  Dr. Goldstein noted that (1) Hurdis was admitted to the hospital in August 2009 for voicing suicidal tendencies to her doctor, which she later claimed was a joke; and her doctors concluded at discharge that she was not suicidal. (AR 421, 423.)  Hurdis reported that since the onset of her pain, she maintained her own personal care, while sharing cleaning and other household chores with her husband and daughter.  (AR 423.)  Dr. Goldstein observed Hurdis's mood was depressed, although Hurdis denied being in a depressed mood.  (AR 423.)  Dr. Goldstein noted that Hurdis was in pain during the interview and showed a guarded and impaired gait.  (AR 423.)

Ultimately, Dr. Goldstein (1) diagnosed Hurdis with depression not otherwise specified and pain disorder associated with both psychological factors and a general medical condition; and (2) assigned her a Global Assessment Functioning Score of 50, which indicated serious symptoms.  (AR 423–24.)  Dr. Goldstein found that Hurdis could understand and remember simple instructions, but would have difficulty carrying them out when she had severe pain and might not respond appropriately to supervisors and co-workers.  (AR 424.)  He further opined that (1) Hurdis could have difficulty

13

maintaining concentration, attention, and work pace; and (2) routine work stresses and changes could increase her irritability and impact her pain.  (*Id*.)


### E.  Administrative Law Judge's Decision

On this record, the ALJ found that Hurdis had not engaged in substantial gainful activity ("SGA") during the period from her alleged onset date of April 1, 2006, through the date she was last insured, September 30, 2007.  (AR 21.)  The ALJ also found that Hurdis had the following severe impairments: fibromyalgia and trochanteric bursitis with back and hip pain.  (AR 21.)  "Through the date last insured," however, the ALJ found that Hurdis "did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 304, Subpart P, Appendix 1."  (AR 24.)  "After careful consideration of the entire record," the ALJ found that:

> through the date last insured, the claimant had the residual functional capacity ["RFC"] to perform light work as defined in 20 CFR 404.1567(a). Specifically, the claimant can lift and/or carry 10 pounds occasionally and five pounds frequently; she can stand and/or walk four hours out of an eight-hour workday; she can sit six hours of an eight-hour workday; she can occasionally climb, balance, stoop, kneel, crouch, and crawl; and she can perform simple repetitive tasks through moderately complex tasks.

(AR 24.)  The ALJ also found that Hurdis was "capable of performing past relevant work as a collection clerk" as "[t]his work did not require the performance of work-related activities precluded by the claimant's residual functional capacity."  (AR 27.)

As a result, the ALJ concluded that Hurdis "was not under a disability, as defined

14

in the Social Security Act, at any time from April 1, 2006, the alleged onset date, through September 30, 2007, the date last insured." (AR 27.)


OPINION

When a federal court reviews a final decision by the Commissioner of Social Security, the Commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's findings under § 405(g), the court cannot consider facts, re-weigh the evidence, decide questions of credibility, or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993).

Even so, a district court may not simply "rubber stamp" an ALJ's decision without a critical review of the evidence. *See Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992). A decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). The ALJ must also explain her "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Id. See also Herron v.*

15

*Shalala*, 19 F.3d 329, 333–34 (7th Cir. 1994).  When an ALJ denies benefits, she must "build a logical and accurate bridge" from the evidence to her conclusion.  *Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001).

Hurdis challenges the decision on three principal grounds: (1) the ALJ's misapplication of the onset date and date last insure; (2) the ALJ's improper dismissal of Hurdis's migraines and mental impairments as nonsevere and (3) the ALJ's failure to properly assess Hurdis's credibility.  For the reasons explained below, the court finds merit in all three grounds and will remand for further proceedings.

## I.      Relevant Time Period

Before the court adjudicates on these issues, a threshold issue regarding the relevant time period(s) must be addressed.  Hurdis's alleged onset date is April 1, 2006.  Her date last insured is September 30, 2007.  The parties spend several pages of their respective briefs arguing about whether the ALJ erred in disregarding material evidence that both predates the onset of Hurdis's alleged disability and postdates the loss of her insurance.  Having reviewed the relevant case law, the court agrees with Hurdis's position.  By focusing her decision and analysis on evidence dated somewhere between April 1, 2006 and September 30, 2007, the ALJ disregarded a substantial amount of material evidence in the administrative record solely because of its date, while "cherry-picking" a few isolated statements in the medical records attributed to Hurdis or a health care professional.  For the reasons explained below, this constitutes reversible error, warranting remand.

16

Social Security Regulations impose a general duty on Hurdis to prove she is disabled.  For example, 20 C.F.R. § 404.1512 provides:

> [Y]ou must bring to our attention everything that shows you are . . . disabled. This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s) and, if material to the determination of whether you are disabled, its effect on your ability to work on a sustained basis.

20 C.F.R. § 404.1512(a).  "Evidence" is defined as "anything you or anyone else submits to us or that we obtain that relates to your claim."  *Id.* § 404.1512(b).  This definition alone suggests it is error for an ALJ to ignore evidence in the administrative record bearing on Hurdis's claimed disabilities simply because it predates Hurdis's alleged onset date or postdates her last date of insurance.  In fact, 20 C.F.R. § 404.1520 provides: "We will consider *all* evidence in your case record when we make a determination or decision whether you are disabled."  20 C.F.R. § 404.1520(a)(3) (emphasis added).

The Commissioner cites *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008), for the proposition that Hurdis had the burden of proving that she was disabled from April 1, 2006 (the alleged onset date) to September 30, 2007 (the date last insured), which is, of course, true as a general proposition.  But the Commissioner later purports to rely on *Eichstadt* in arguing *any* evidence that predates the alleged onset date and postdates the date last insured is irrelevant and need not be considered by the ALJ.  (Pl.'s Br. 11–12.) *Eichstadt* says the opposite.

In *Eichstadt*, the claimant applied for disability insurance benefits for 15 years after her date last insured, and the ALJ found, based on the evidence in the record, that she

17

was not disabled before that date. *Eichstadt*, 534 F.3d at 665. The claimant appealed, arguing that the ALJ erroneously refused to consider evidence that postdated her date last insured. *Id.* at 667. The Seventh Circuit disagreed, explaining that the ALJ did not "fail to consider this evidence, but instead she examined it *as required*." *Id.* (emphasis added). Specifically, the court found that the ALJ in *Eichstadt* examined and considered the evidence that postdated the date last insured and provided specific reasons for discounting it.

The Seventh Circuit similarly explained that an ALJ must consider *all* evidence in the administrative record -- even evidence that predates the alleged onset date -- as such evidence may be particularly relevant to assessing a claimant's disability after the alleged onset date. *See Eichstadt*, 534 F.3d at 667 (ALJ did not refuse to consider evidence based on its date "but instead she examined it as required"); *Johnson v. Sullivan*, 915 F.2d 1575, at *3 (7th Cir. 1990) (unpublished disposition) ("Johnson is correct that the ALJ should consider the record as a whole, including pre-onset evidence (particularly relating to a degenerative condition) and post-onset evidence."); *Halvorsen v. Heckler*, 743 F.2d 1221, 1225–26 (7th Cir. 1984) ("There can be no doubt that medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period.").

Other circuits have held similarly. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (citing 20 C.F.R. § 404.1520(a)(3)) ("The ALJ did not consider any of her medical evidence before 2001, the year she claimed her disability began. This is error

because the regulations require the ALJ to 'consider all evidence in [the] case record when [he] makes a determination or decision whether [claimant is] disabled.'"); *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. Appx. 411, 414 (6th Cir. 2006) (unpublished decision) ("We do not endorse the position that all evidence or medical records predating the alleged date of the onset of disability . . . are necessarily relevant . . .  We recognize that evidence . . . predating the onset of disability, when evaluated *in combination with later evidence*, may help establish disability.").

While the ALJ's opinion states that she "considered the medical evidence in its entirety" (AR 23) and "reviewed and considered all the evidence of record" (AR 25), her written analysis undercuts that assertion.  As a general matter, the ALJ's opinion "notes a significant amount of treatment records pre-date the period of adjudication" as well as "a significant amount of medical evidence for a period after the period of adjudication" (AR 25), yet discusses almost none of that evidence.  Instead, the ALJ's decision appears to disregard almost all relevant evidence that existed outside of these dates.  For example, the ALJ notes that:

- There is evidence in the file that the claimant received treatment for migraine headaches.  However, the treatment received was all before the alleged onset date.  Similarly, the personnel records documenting absences from work were all for a period before the alleged onset date.  (AR 22.)
- There was no objective medical evidence indicating the claimant received any mental health treatment from a mental health professional at or after the alleged onset date through the date last insured.  (AR 23.)
- There is no evidence of any mental health treatment for that period.  (AR 24.)

- While the claimant alleged disability beginning on April 1, 2006, the evidence of record contains very little evidence from this date through the date last insured of September 30, 2007.  (AR 25.)

Even these troubling comments might be understandable if this evidence were plainly irrelevant, but as discussed in detail below, much of this evidence is not only deserving of the ALJ's consideration, it is *material* to Hurdis's claims of disability.

The ALJ's apparent failure to even consider pre-April 1, 2006 evidence and post-September 30, 2007 evidence reflected in these comments would arguably mandate remand of this case on that ground alone, although the court finds even stronger reasons to do so below.  On remand, the Social Security Administration must consider material evidence in the administrative record.  Of course, the court expresses no opinion as to what weight the evidence deserves, only that the ALJ's treatment of this evidence is balanced.[1]


## II.    Migraines and Mental Impairments

Hurdis next argues that the ALJ improperly dismissed Hurdis's migraines and mental impairments as non-severe.  The applicable regulation states:

---

[1] Since this case is being remanded, the ALJ should explain the weight afforded any relevant medical *sources* in the record that precedes April 1, 2006, and post-dates September 30, 2007. This obviously includes relevant treating sources, nontreating sources, and nonexamining sources. *See* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). As the Commissioner has explained, paragraph 20 C.F.R. § 416.927 clarifies "that administrative law judges are required to *explain in their decisions the weight* given to any opinion of a State agency medical or psychological consultant or other program physician or psychologist, as they must do for any opinions from treating sources, nontreating sources, and nonexamining sources who do not work for us."  65 FR 11866-02 (emphasis added).  Given that additional evidence will now be considered that falls outside the onset and last-insured dates, this may well require that the ALJ re-consider the weight originally assigned to some of the medical sources referred to in her previous decision.

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled.  We will not consider your age, education, and work experience.

20 C.F.R. § 404.1520(c); *see also id.* § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

"Basic work activities" are "the abilities and aptitudes necessary to do most jobs." *Id.* § 404.1521(b).  Such abilities and aptitudes include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting.  *Id.*

This step-two "severity" inquiry is generally considered a *de minimis* screening device used to dispose of groundless claims.  *See Samuel v. Barnhart*, 295 F. Supp. 2d 926, 952 (E.D. Wis. 2003) (collecting cases).

> A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the person's physical or mental ability(ies) to perform basic work activities. If such a finding is not clearly established by medical evidence . . . adjudication must continue through the sequential evaluation process.

SSR 85-28.

The Commissioner first argues that even if the ALJ did err in finding that Hurdis's migraines and mental impairments were not severe, it "is not reversible error because the

21

ALJ found that Hurdis had other severe impairments and evaluated the combined effects of all of Hurdis's impairments at steps three and four of the sequential evaluation process."  (Def.'s Br. 10 (citing *Castile v. Astrue*, 617 F.3d 923, 926–27 (7th Cir. 2010)). Certainly, the ALJ's recognition of other severe impairments -- namely, fibromyalgia, trochanteric bursitis with back and hip pain -- obligated her to proceed with the evaluation process and consider the aggregate effect of the entire constellation of ailments at steps three and four.  *Castile*, 617 F.3d at 927.  The Commissioner, however, points to no specific instances (nor can the court find any instances) in step three or four where the ALJ considers Hurdis's migraines or mental impairments.  For reasons explained below, the error is anything but harmless.

### A.  Mental Impairments

The ALJ concluded that Hurdis's "medically determinable mental impairment of depression did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and was therefore non-severe."  (AR 22.)  The ALJ made this finding after considering the following four criteria in paragraph B of the listing: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation.

The ALJ ultimately concluded that the claimant had none to mild limitation in her activities of daily living; the claimant had none to mild limitation in the area of social functioning; the claimant had none to mild limitation in her concentration, persistence or pace; and the claimant had experienced no episodes of decompensation which have been

of extended duration.    (AR 22–23.)    But to come to this conclusion, the ALJ impermissibly cherry picked the medical evidence that favored her conclusion. *See Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014); *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013) ("An ALJ cannot rely only on the evidence that supports her opinion."); *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000) ("Case law in the Seventh Circuit holds that '[a]n ALJ may not simply select and discuss only that evidence which favors his [or her] ultimate conclusion. Rather, an ALJ's decision must be based upon consideration of all the relevant evidence.").

In finding that Hurdis had none to mild limitation in daily living, the ALJ reasoned that Hurdis "admitted performing household chores including cooking, light cleaning, driving and helping her daughter with homework." (AR 22.) In fact, Hurdis admitted performing such activities in a September 24, 2009, consultative psychological evaluation with Dr. Goldstein. However, at that same evaluation, Dr. Goldstein diagnosed Hurdis with depression. (AR 421–24.) The ALJ gave Dr. Goldstein's opinion and diagnosis little weight because it was rendered after the claimant's date last insured. (AR 24.) The ALJ points out that Dr. Goldstein's opinion was "related to the claimant's current mental condition and not what her mental condition was, on or before, September 30, 2007." (AR 24.) By the same token, Hurdis's admissions about her activities of daily living also related to claimant's current activities of daily living and not what her activities of daily living were on or before September 30, 2007.[2]

---

[2] As noted later, the ALJ recognizes this point in her step-four credibility inquiry. (AR 25.)

Even more troubling is the ALJ's finding that Hurdis had none to mild limitation in social functioning, based on a 2009 comment by Hurdis that she socialized with friends and family.   (AR 22.)   To support her reasoning, the ALJ again cites Dr. Goldstein's consultative psychological evaluation.   However, Dr. Goldstein's evaluation says much more than the ALJ suggests.   The evaluation with respect to social functioning reads in full:

> Ms. Hurdis sees family and friends across the street. She does not attend church. Her circle has gotten smaller. She says she is frequently irritable, but does not have temper tantrums and is not impulsive. She relates appropriately to the examiner, with good eye contact, but not much rapport.

(AR 423.)   Moreover, Dr. Goldstein concludes that Hurdis "is irritable and [may] not respond appropriately to supervisors and co-workers."   (AR 424.)   Still, the ALJ did not consider these statements, which appear to undermine substantially her finding of none to mild social functioning.

Similarly, in finding that Hurdis had none to mild limitation in concentration, persistence, or pace, the ALJ reasoned that Hurdis admitted helping her 13-year-old daughter with homework.   (AR 23.)   Again, the ALJ cherry picked from a small portion of

---

> In addition to the claimant's testimony, the undersigned has also considered the function report completed on April 8, 2009 (Exhibit 4E). The undersigned notes this function report was completed more than a year after the claimant's date last insured. Therefore, the claimant is stating her activities and limitations for the period after her date last insured. As such, these limitations are not relevant with respect to this application.

(AR 25.)   The ALJ does not explain, however, why the statements from a 2009 consultative psychological evaluation with Dr. Goldstein are any different.   Instead, the ALJ finds that Hurdis's statements which are helpful to her analysis are relevant while Hurdis's statements which undermine her analysis are not.

24

Dr. Goldstein's consultative psychological evaluation.   One page earlier, the same evaluation reads:

> Concentration – Ms. Hurdis has difficulty with concentration. She is unable to subtract serial sevens from 100 and slowly subtracts five serial threes in 39 seconds, but makes one error. She spells WORLD, but spells in backward as "DLOW." Claimant does enact a three-step command and follows the conversation without apparent difficulty.

(AR 422.)   The law does not allow the ALJ to rely on one comment that favors an outcome while ignoring as strong, if not stronger, evidence to the contrary.   *See Bates*, 736 F.3d at 1099.

The ALJ concluded that "[t]here was no objective medical evidence indicating the claimant received any mental health treatment from a mental health professional from the alleged onset date through the date last insured."   (AR 23.)   Further, the ALJ concluded there is no evidence of any mental health treatment for the period at issue. (AR 24.)   The ALJ ignores the fact that Hurdis was taking various psychiatric medications throughout 2006 and 2007.   Specifically, in 2006 and 2007 Hurdis was taking Citalopram -- a drug used to treat depression (AR 367); Effexor -- a drug also used to treat depression (AR 363, 482); and Xanax -- a drug used to treat anxiety and panic disorders (AR 356).   At minimum, this substantial drug regimen for depression and related conditions is evidence that the ALJ should have considered in her step-two severity inquiry.

Finally, as discussed in Part I of this opinion, 20 C.F.R. § 404.1520 and the Seventh Circuit require the ALJ to consider *all* material evidence in the administrative

record, including evidence that predates the alleged onset date and evidence that postdates the date last insured. Because the ALJ based her superficial analysis only on a lack of specific mental health evidence between April 1, 2006 (the alleged onset date) and September 30, 2007 (the date last insured), she necessarily failed to consider evidence relevant to whether or not Hurdis's mental impairments were "severe." *See supra* pp. 10–13 for a discussion of some of such evidence. The ALJ should consider all evidence in the record on remand.

### B. Migraines

The ALJ found that the claimant's medically determinable impairment of migraine headaches was non-severe. (AR 22.) The ALJ reasoned:

> There is objective evidence in the medical record that the claimant has been evaluated and treated for migraine headaches, interstitial cystitis and an anal fissure. However, these conditions were managed medically, and appear controlled by adherence to recommended medical management and medication compliance.
>
> There is evidence in the file that the claimant received treatment for migraine headaches (Exhibit 10F/4-5 and Exhibit 13F). However, the treatment received was all before the alleged onset date. Similarly, the personnel records documenting absences from work were all for a period prior to the alleged onset date (Exhibit 1E). The evidence of record does not document any further complaints referable to the headaches.

(AR 22.) Thus, the ALJ seemingly dismissed Hurdis's headaches as non-severe in part because: (1) they were controlled by medical management; and (2) there is no evidence of treatment received for the headaches during the relevant time period.

Even superficially, this two-part reasoning seems inconsistent. Since Hurdis's

headaches were controlled by medical management during the relevant time period, there *is* evidence of treatment received for the headaches during the relevant time period. Specifically, as Hurdis correctly points out, there is medical evidence in the record that Hurdis was taking 25 mg of Topamax every night in January 2007 for her headaches. (AR 363). Again, the court can only speculate as to what role this evidence played in the ALJ's determination, since it is not addressed by the ALJ in her step-two severity inquiry. *See* 20 C.F.R. § 404.1520 ("We will consider all evidence in your case record when we make a determination or decision whether you are disabled.").

The Commissioner argues that the ALJ reasonably found that Hurdis's migraines were not severe because they were effectively controlled by medication (Def.'s Br. 10), but the ALJ's failure to even address evidence that Hurdis was taking Topamax, much less explain her reasoning, makes meaningful appellate review of the Commissioner's decision on this issue impossible. *See Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (explaining that "where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded"). Moreover, as previously addressed, there is also evidence in the record of Hurdis's migraines that the ALJ failed to consider because it predated the alleged onset date or postdated the date last insured. For example, there is evidence in the record from Hurdis's employer that she missed work on twenty-eight occasions between 2004 and 2006 because of her headaches. (AR 136–64.) The ALJ summarily dismissed these absences from work, because they all occurred before "the alleged onset date." (AR 22.)

The ALJ did not consider the absences beyond that.  On remand, the ALJ must at least consider this evidence, along with all other evidence in the record, when determining whether Hurdis's migraines were "severe" on the last day of her insurance.

## III.    Credibility

Generally, an ALJ's determinations regarding credibility are entitled to special deference and will be overturned only if it is patently wrong.  *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010).  Such deference, however, does not excuse the ALJ from explaining the reasons for her credibility determination.  *Id.*  The general requirement to build an "accurate and logical abridge" between the evidence and the decision still applies.  *Id.*  Further, "a credibility determination must contain specific reasons for the finding," and it "must be specific enough to enable the claimant and a reviewing body to understand the reasoning."  *Craft v. Astrue*, 539 F.3d 668, 678 (2008).  "Where the credibility determination is based on objective factors rather than subjective considerations, we have greater freedom to review the ALJ's decision."  *Id.*

The ALJ starts the step-four credibility assessment by summarizing Hurdis's subjective testimony, concluding that Hurdis's "allegations concerning the intensity, persistence and limiting effects of her symptoms are less than fully credible because those allegations are greater than expected in light of the objective medical evidence of record." The ALJ, however, fails to identify which statements are credible.  This kind of superficial analysis has been repeatedly criticized by the Seventh Circuit.  *See Spiva v. Astrue*, 628

28

F.3d 346, 346 (7th Cir. 2010) (criticizing "opinions of administrative law judges denying benefits routinely state (with some variations in wording) that although 'the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, . . . the claimants statements concerning intensity, persistence and limiting effects of these symptoms are not entirely credible,' yet fail to indicate which statements are not credible and what exactly 'not entirely' is meant to signify"); *Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010) (language is "meaningless boilerplate" because "statement by a trier of fact that a witness's testimony is 'not entirely credible' yields no clue to what weight the trier of fact gave the testimony").

Unfortunately, this is just the first of several examples where the ALJ reduced her step-four analysis to meaningless boilerplate.  The ALJ also states:

> After careful consideration of the evidence the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(AR 25.)  The Seventh Circuit has repeatedly criticized this language as well, because it "backwardly implies that the ability to work is determined first and is then used to determine the claimant's credibility."  *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012).  *See also Bjornson v. Astrue*, 671 F.3d 640, 645–46 (7th Cir. 2012) ("[T]he boilerplate implies that the determination of credibility is deferred until ability to work is assessed without regard to credibility, even though it often can't be."); *id.* at 646 (directing Social Security Administration to "take a close look at the utility and

intelligibility of its 'templates'").

Yet another example: the ALJ concluded that the claimant's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," but does not say which ones.   In contrast, Social Security Ruling 96-7p provides:

> When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, *the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities.* This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

SSR 96-7p (emphasis added).   The same Ruling continues:

> In determining the credibility of the individual's statements, *the adjudicator must consider the entire case record,* including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work *may not be disregarded solely because they are not substantiated by objective medical evidence*.

*Id.* (emphasis added).   Herein lies two closely related errors.   First, the ALJ did not consider the *entire* case record.   Instead, the ALJ considered only the objective medical evidence in the record.[3]   This leads directly to the second error.   The ALJ disregarded

---

[3] Of course, as the court continues to point out, the ALJ did not consider *all* the objective medical evidence in the record.   The ALJ only discussed the objective medical evidence between the alleged onset date and the date last insured.   Further, the ALJ did not consider Hurdis's migraines and mental impairments, because she determined Hurdis's migraines were not severe.   On remand, the Social Security Administration must be sure to consider *all* the evidence in the administrative record when making its credibility determination.   This includes evidence of

30

Hurdis's subjective complaints solely because they were not substantiated by objective medical evidence.  Moreover, because the ALJ found that Hurdis's impairments could produce at least some of her symptoms, she "was forbidden from rejecting plaintiff's testimony based solely on a lack of support in the medical evidence." *Koepp v. Astrue*, 2011 U.S. Dist. LEXIS 80506, at *24–25 (E.D. Wis. July 22, 2011); SSR 96-7p.

> As the Seventh Circuit explains:
>
> If the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant.  She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties.

*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994) (internal citations omitted). Specifically, the ALJ should have considered such things as: (1) Hurdis's daily activities; (2) the location, duration, frequency, and intensity of Hurdis's pain and other symptoms; (3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measure other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board);

---

Hurdis's migraines and mental impairments.  *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) ("[W]e have frequently reminded the agency that an ALJ must consider the combined effects of all the claimant's impairments, even those that would not be considered severe in isolation.").

(6) and any other factors concerning the individual's functional limitation and restrictions due to pain or other symptoms.   20 C.F.R. § 404.1529(c); 20 C.F.R. 416.929(c); SSR 96-7p.  The ALJ essentially failed to consider any of these factors.

The Commissioner argues weakly that the ALJ did consider Hurdis's activities. (Def.'s Br. 16–17.)  As previously discussed, this much is true, at least to an extent.  To start her step-four credibility assessment, the ALJ notes that Hurdis admitted "driving her 13-year-old daughter to school" and "performing chores, including cooking."[4]  (AR 25.) Even here, however, the ALJ failed to say how Hurdis's ability to drive her daughter to school and cook *translates* into an ability to work full time.  *See Carradine v. Barnhart*, 360 F.3d 751, 755 (7th 2004) ("[The ALJ] failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week.").  As the Seventh Circuit has explained:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons [in this case, Hurdis's husband and daughter], and is not held to a minimum standard of performance, as she would by an employer.  The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

---

[4] The Commissioner erroneously adds that the ALJ   noted that Hurdis "told examining psychologist Dr. Goldstein that she maintained her personal care and shared cleaning and other household chores with her husband and daughter" and Hurdis "told Dr. Zoeller that she was home schooling her daughter."  However, the ALJ made no such note, making these arguments, like many others made by the Commissioner, impermissibly *post hoc*.  *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

*Bjornson*, 671 F.3d at 647 (collecting cases).

As Hurdis points out, there is also evidence in the record that tends to *disprove* any link between Hurdis's ability to perform limited daily activities and her ability work a full-time job.  For example, Hurdis testified that she could not sit or stand for more than 10 minutes at a time, she could not drive further than three blocks, she spent 99 percent of her time lying down, and had to rely on the help of her husband and daughter to cook and clean.  (AR 57–59.)  These are all things the ALJ should have considered and must consider on remand.

## IV.    Remaining Issues for Remand

Three further issues are worth addressing, if only briefly.  The *first* involves the statements of a Social Security Administration employee, P. Hepp.  In her briefing, Hurdis argues that the ALJ failed to consider observations recorded by Hepp after assisting her complete a Disability Report over the telephone on February 13, 2009.  (*See* Pl.'s Br. 29; AR 175.) Hepp wrote:

> Claimant just seemed overwhelmed by the whole process.  If it's possible to send "pain" over the phone, she seemed to in a lot of pain.  At times she asked if she could just put the phone down because she couldn't hold it up anymore.

(AR 175.)

Generally, the ALJ must consider such observations.  SSR 96-7p ("The adjudicator must also consider any observations about the individual recorded by Social Security Administration (SSA) employees during interviews, whether in person or by telephone.").

While the court is sympathetic to the fact that an "ALJ need not evaluate in writing every piece of testimony and evidence submitted," the ALJ cannot "ignore an entire line of evidence" and must "sufficiently articulate [her] assessment of the evidence to 'assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the AL's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 180 (7th Cir. 1993). Here, the ALJ did not consider Ms. Hepp's observations at all. There is no reasoning to trace, and there is nothing "to show that the ALJ considered the evidence the law requires [her] to consider." *Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985).

The *second* issue involves the ALJ's decision at step four of the sequential evaluation process. Specifically, Hurdis argues that the ALJ erred by finding that she could return to past-relevant work as a collection clerk. The court agrees based on all the deficiencies already described in this opinion, but in subscribing to Hurdis's argument, the court does not intend to suggest the result that should be reached on remand. Rather, the court encourages the parties, as well as the ALJ, to consider the material evidence as a whole and the issues anew once these deficiencies are addressed.

Hurdis *third* criticizes the ALJ's following, truncated analysis as to whether her impairments meet one of the listed impairments:

> The claimant's impairments, considered singly and in combination, do not meet or medically equal the criteria of any medical listing. No treating or examining physician has recorded findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairments.

(AR 24.) The problem with Hurdis's criticism is that she has "the burden of proving"

34

that her impairments meet a listing. *See Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999) ("The claimant bears the burden of proving his condition meets or equals a listed impairment."). But should Hurdis plausibly argue for the application of one or more listings on remand, then the ALJ must provide reasoning that supports her acceptance or rejection of those specific listings. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (ALJ's failure to "mention the specific listings he is considering . . . *if combined with a 'perfunctory analysis,'* may require a remand") (emphasis added).

## ORDER

IT IS ORDERED that the decision of defendant Carolyn W. Colvin, Commissioner of Social Security, denying Plaintiff Patricia Hurdis's application for disability benefits is REVERSED AND REMANDED under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The clerk of court is directed to enter judgment for plaintiff and close this case.

Entered this 10th day of December, 2014.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

35